[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

Nos. 23-13254, 23-13383

————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

MARK GYETVAY,

Defendant-Appellant.

————————————————

Appeals from the United States District Court
for the Middle District of Florida

D.C. Docket No. 2:21-cr-00083-JNE-NPM-1

————————————————

Before ROSENBAUM, LAGOA, and WILSON, Circuit Judges.

LAGOA, Circuit Judge:

Mark Gyetvay, an American accountant and financial executive who worked for many years in Russia, was indicted on a variety of tax-related charges, following an investigation into his alleged tardy filings and concealment of funds in Swiss bank accounts. Gyetvay was convicted at trial of four counts: failure to file income tax returns for 2013 and 2014 in violation of 26 U.S.C. § 7203, making false statements on his Streamlined Foreign Offshore Procedures certification in violation of 18 U.S.C. § 1001, and failure to file a 2014 Foreign Bank Account Report in violation of 31 U.S.C. §§ 5314 and 5322(a).

On appeal, Gyetvay raises four arguments. First, he argues that the district court erred in tolling the statute of limitations for Counts 10 and 11, which charged failure to file tax returns in violation of 26 U.S.C. § 7203. Second, he argues that the district court erred in denying his motion to suppress a search warrant authorizing seizure of his email account because both the warrant and seizure violated the Fourth Amendment. Third, he argues that the government constructively amended or materially varied from Count 13 of the indictment, which charged failure to file a 2014 Foreign Bank Account Report, violating the Fifth Amendment. Finally, he argues that the district court made a variety of errors at sentencing, including in calculating his guideline range and ordering him to pay $4,021,074 in restitution to the IRS. After careful

review, and with the benefit of oral argument, we affirm in part, reverse in part, vacate in part, and remand for resentencing.

## I.        FACTUAL AND PROCEDURAL BACKGROUND

Every American citizen making a gross income above a minimum exemption amount must file annual tax returns. 26 U.S.C. §§ 6011(a), 6012(a). Under 26 U.S.C. § 7203, willfully failing to timely file income tax returns is a misdemeanor.[1] Additionally, under the Bank Secrecy Act and its implementing regulations, every American citizen with interests in or authority over a foreign bank account with a balance exceeding $10,000 must file an annual

---

[1] 26 U.S.C. § 7203 provides as follows:

> Any person required under this title to pay any estimated tax or tax, or required by this title or by regulations made under authority thereof to make a return, keep any records, or supply any information, who willfully fails to pay such estimated tax or tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $25,000 ($100,000 in the case of a corporation), or imprisoned not more than 1 year, or both, together with the costs of prosecution. In the case of any person with respect to whom there is a failure to pay any estimated tax, this section shall not apply to such person with respect to such failure if there is no addition to tax under section 6654 or 6655 with respect to such failure. In the case of a willful violation of any provision of section 6050I, the first sentence of this section shall be applied by substituting "felony" for "misdemeanor" and "5 years" for "1 year".

Report of Foreign Bank and Financial Accounts form (known as an "FBAR") with the IRS, identifying and describing that account. *See* 31 C.F.R. §§ 1010.306(c), 1010.350(a). "These reports are designed to help the government 'trace funds' that may be used for 'illicit purposes' and identify 'unreported income' that may be subject to taxation separately under the terms of the Internal Revenue Code." *Bittner v. United States*, 598 U.S. 85, 89–90 (2023) (quoting IRS Pub. 5569, Report of Foreign Bank & Financial Accounts (FBAR) Reference Guide, p.1 (Rev. 3–2022)). Willful failure to file an FBAR is a felony under 31 U.S.C. § 5322(a).

Gyetvay, an American citizen, is an accountant and financial executive. In the 1990s and early 2000s, Gyetvay worked in the Moscow office of PriceWaterhouseCoopers, eventually achieving the rank of partner. In 2003, he left PriceWaterhouseCoopers to become the Chief Financial Officer of Novatek, Russia's largest private natural gas company. In 2005, Gyetvay was the "point man" for Novatek's initial public offering ("IPO"). Over the next several years, in exchange for his work on the IPO, Gyetvay received $9.35 million in the form of a call option and 7,287,134 shares of Novatek stock, on top of millions of dollars in annual income. In 2007, he deposited the $9.35 million in a Swiss bank account held in the name of Opotiki Marketing Ltd. (the "Opotiki account"). In 2009, he deposited the Novatek stock in a Swiss securities account held in the name of Felicis Commercial Corp. (the "Felicis account"). Both accounts were opened at Coutts Bank.

In mid-2010, Coutts Bank informed Gyetvay that his Opotiki and Felicis accounts needed to be closed or declared tax compliant by the end of June 2010. Gyetvay then closed the Opotiki and Felicis accounts at Coutts and transferred them to another Swiss bank, Hyposwiss, this time listing his then-wife, Nadezda Gavrilova, as the "beneficial owner" of both accounts. Coutts recorded Gyetvay's "reason for departure" from the bank as "U.S. client not tax compliant."

Around September 2010, Gyetvay hired an accountant named Alex Knight to prepare his U.S. income tax returns for 2006–2009. By that point, Gyetvay's tax returns for 2006, 2007, and 2008 were already late. To aid in the preparations, Knight asked Gyetvay whether he had any foreign bank accounts, and Gyetvay indicated that he had only "[o]ne account" in Russia with a balance over $10,000. Knight also informed Gyetvay of his obligation to file FBAR forms for the preceding years, but, according to Knight, Gyetvay dismissed the recommendation and did not file FBARs for the years prior to 2010. Gyetvay concedes that he "did not file timely tax returns or FBARs from 2008 to 2013," and he admits that the "Felicis account went undisclosed" throughout that entire period.

In 2014, Coutts Bank notified Gyetvay that it was participating in a program, established by the U.S. and Swiss governments, that would require it to provide U.S. tax authorities with information about Gyetvay's past accounts at Coutts. Coutts advised Gyetvay of the IRS' "Streamlined Foreign Offshore Procedures,"

which allowed taxpayers to file any delinquent tax returns for the most recent three years and any delinquent FBARs for the most recent six years. To participate in the Streamlined Procedures, taxpayers had to certify that any prior failures to file tax returns, report foreign accounts, and pay taxes were "non-willful," *i.e.*, "due to negligence, inadvertence, or mistake" or "a good-faith misunderstanding of the requirements of the law." In 2014, Gyetvay retained the firm Anaford to help him with the Streamlined Procedures, and in 2015, he submitted his Streamlined filing to the U.S. government, along with his long-tardy tax returns for 2011–2013 and FBARs for 2008–2013. Gyetvay reported in his late-filed 2013 FBAR that the Felicis account had grown to contain $84,264,354, while the Opotiki account held $9,148,420. In his Streamlined filing, Gyetvay certified that his "delay in filing U.S. tax returns [was] not due to any willfulness, but rather the result of [his] reasonable attempts to comply with increasingly difficult administrative requirements." In June 2015, Gyetvay filed a late FBAR for 2014, in which he represented that he had signature authority over—but no financial interest in—a single Swiss bank account containing an "amount unknown." It is undisputed that Gyetvay intentionally "omitted the Opotiki account" from his 2014 FBAR (although Gyetvay insists that it was because he "[ran] out of blank fields" on the form).

Eventually, a grand jury began investigating the veracity of Gyetvay's statements on his Streamlined certification, as well as his history of tax evasion, failure to report income, "use of secret Swiss bank accounts," and "failure to disclose the existence of those accounts to the government as required." Before an indictment was

returned, the government filed an *ex parte* application under 18 U.S.C. § 3292(a)(1) to suspend the running of the statute of limitations for certain "Target Offenses" that the grand jury was investigating.  On April 3, 2020, the district court overseeing the grand jury investigation granted that application and tolled the statute of limitations "for the offenses set forth in the government's *ex parte* application."

The grand jury returned an initial indictment on September 22, 2021, and a second superseding indictment on May 4, 2022 (which we'll refer to as the "superseding indictment").  In the superseding indictment, the grand jury charged Gyetvay with three counts of assisting in the preparation of false tax returns, in violation of 26 U.S.C. § 7206(2) (Counts 1–3), three counts of tax evasion, in violation of 26 U.S.C. § 7201 (Counts 4–6), and five counts of willfully failing to file income tax returns between 2010–2014 (Counts 7–11).  Count 12 charged Gyetvay with willfully making false statements on his IRS Streamlined Procedures certification, in violation of 18 U.S.C. § 1001.  Count 13 charged Gyetvay with willfully failing to file an FBAR disclosing that he had a financial interest in, and signature and authority over, a foreign bank account, "to wit, the Opotiki account."  Counts 14 and 15 charged Gyetvay with wire fraud.

Gyetvay went to trial in March 2023.  The jury returned a guilty verdict on four of the fifteen counts: Counts 10 and 11 (failure to file income tax returns for 2013 and 2014), Count 12 (making false statements on his Streamlined certification), and Count 13

(failure to file a compliant 2014 FBAR). The jury acquitted Gyetvay on one of the counts of wire fraud and hung on all other charges. The district court sentenced Gyetvay to 86 months' imprisonment and ordered him to pay $4,021,074 in restitution to the IRS.

## II.    ANALYSIS

### A.    Tolling the Statute of Limitations

The first issue in this case poses a question of first impression for this Court: under 18 U.S.C. § 3292(a)(1), can a district court toll the statute of limitations for an offense that was not identified in the government's *ex parte* tolling application? Under a plain reading of the statute, we conclude that the answer is no.

Gyetvay was convicted of Counts 10 and 11 of the superseding indictment, which charged him with willful failure to file federal income tax returns for the years 2013 and 2014, in violation of 26 U.S.C. § 7203. The statute of limitations for § 7203 is six years. 26 U.S.C. § 6531(4). Gyetvay's 2013 tax return was due on October 15, 2014, and his 2014 tax return was due on April 15, 2015. The initial indictment was filed on September 22, 2021. The parties thus agree that, absent tolling of the statute of limitations, Counts 10 and 11 are time-barred, since the indictment was returned more than six years after the deadlines for Gyetvay's 2013 and 2014 tax returns.

In a criminal case, upon application of the government, 18 U.S.C. § 3292 allows for the tolling or "suspension" of the statute of limitations if several conditions are met. The statute provides:

23-13254                Opinion of the Court                    9

> Upon application of the United States, filed before re-
> turn of an indictment, indicating that evidence of an
> offense is in a foreign country, the district court before
> which a grand jury is impaneled to investigate the of-
> fense shall suspend the running of the statute of lim-
> itations for the offense if the court finds by a prepon-
> derance of the evidence that an official request has
> been made for such evidence and that it reasonably
> appears, or reasonably appeared at the time the re-
> quest was made, that such evidence is, or was, in such
> foreign country.

*Id.* § 3292(a)(1). In interpreting this statute, this Court has held that, due to the "*ex parte* nature of § 3292 proceedings," and because "statutes of limitations are themselves mechanisms for ensuring the reliability of evidence submitted in court proceedings," § 3292(a)(1) requires the government to "provide something with evidentiary value—that is, testimony, documents, proffers, and other submissions bearing some indicia of reliability—tending to prove it is reasonably likely that evidence of the charged offenses is in a foreign country." *United States v. Trainor*, 376 F.3d 1325, 1332 (11th Cir. 2004). The district court must make findings by a pre-ponderance of the evidence, while the government bears its own burden of presenting the court with enough evidence to satisfy that standard, which "requires the trier of fact to believe that the exist-ence of a fact is more probable than its nonexistence[.]" *Id.* at 1331 (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 622 (1993)).

On April 3, 2020, during the investigatory stage of this case, the government filed an *ex parte* application under § 3292(a)(1) to suspend the running of the statute of limitations for certain "Target Offenses." In support of its application, the government represented that:

> A grand jury duly empaneled in this district has been investigating Mark Gyetvay with respect to false statements he made on a voluntary disclosure he filed with the IRS, his use of secret Swiss bank accounts, his failure to disclose the existence of those accounts to the government as required, and his potential failure to report all income earned through the accounts. Possible criminal charges against Gyetvay include: (i) tax evasion, in violation of 26 U.S.C. § 7201; (ii) filing false tax returns and documents with the IRS, in violation of 26 U.S.C. § 7206(1); (iii) aiding and assisting in the preparation and presentation of false documents with the IRS, in violation of 26 U.S.C. § 7206(2); (iv) impeding the due administration of the Internal Revenue laws, in violation of 26 U.S.C. § 7212(a); (v) conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; (vi) false statements to the United States, in violation of 18 U.S.C. § 1001; (vii) failure to file FBARs, in violation of 31 U.S.C. §§ 5314 and 5322; and wire fraud and conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1343 and § 1349; ("the Target Offenses").

The government averred that "evidence of [these] Target Offenses, to wit, bank account, business records, and foreign tax records, are

[*sic*] located in Switzerland, Russia, and Cyprus." The district judge for the grand jury investigation granted the application to suspend the "running of the statute of limitations for the offenses set forth in the government's *ex parte* application," based on its finding that "it reasonably appears that evidence of the Target Offenses is located in Switzerland, Russia, and Cyprus." Neither the application nor the tolling order identified a violation of § 7203 as one of the "Target Offenses."

On May 4, 2022, the grand jury returned the second superseding indictment, which indicted Gyetvay for violations of § 7203, including for willfully failing to make income tax returns for calendar years 2013 and 2014 in Counts 10 and 11. The § 7203 violations were not charged in the initial indictment, and Gyetvay moved to dismiss the superseding indictment, including Counts 10 and 11, on grounds of untimeliness. The government argued, in response, that the tolling order applied to those charges, despite the fact that the government's application did not identify the statute under which those offenses were charged, and the tolling order contained no evidentiary findings for those charges. The district court denied Gyetvay's motion to dismiss without prejudice. The government then filed a motion *in limine* requesting that the court "find that the tolling order properly tolled the statute of limitations on April 3, 2020," for "all charges in the Indictment." Without much explanation, the district court granted that motion, finding that "the United States' application under Section 3292 . . . [was] valid and properly applicable to all charges in the [superseding] indictment," including Counts 10 and 11.

On appeal, Gyetvay contends that the district court erred in tolling the statute of limitations for Counts 10 and 11 of the indictment. Gyetvay's argument is straightforward: On his reading of the statute, the phrase "the offense" within § 3292(a)(1) refers to the offense that the government seeks to be tolled—here, the offense of failure to file tax returns in violation of § 7203. Because the government never applied for tolling of the offense of failure to file tax returns in violation of § 7203, Gyetvay reasons, the statute of limitations for those offenses should not have been tolled, and the charges were time-barred. Gyetvay further argues that, even if the government had included § 7203 in its application, the district court itself erred because it failed to make its required factual findings under § 3292(a)(1).

The government acknowledges that it did not "cite 26 U.S.C. § 7203 (willful failure to file a tax return)" in its tolling application, but it asserts that it did not need to. According to the government, its "description of the offenses" was sufficiently specific to "cover[ ] the failure-to-file offenses ultimately charged in Counts 10 and 11." The government adds that a Special Agent's declaration filed in support of the tolling application did mention Gyetvay's failure to file timely income tax returns, so (in the government's view) the district court was correct to later find that the application and tolling order tolled the limitations period for Counts 10 and 11.

To sum up, the government's *ex parte* application sought tolling for eight "Target Offenses," none of which charged a violation of § 7203. The tolling order issued during the investigatory

23-13254          Opinion of the Court          13

period of the case suspended the running of the statute of limitations "for the offenses set forth" in the application. Nonetheless, the district court later read the government's tolling application and the investigating judge's tolling order to have suspended the statute of limitations for both counts alleging violations of § 7203.

The application of a statute of limitations is a question of law reviewed *de novo*, while a district court's findings of fact are reviewed for clear error. *Trainor*, 376 F.3d at 1329–30. When it comes to questions of statutory interpretation, we begin, as always, "by examining the text of the statute to determine whether its meaning is clear." *Harry v. Marchant*, 291 F.3d 767, 770 (11th Cir. 2002) (en banc). Indeed, "[i]n construing a statute," we "often should end as well, with the language of the statute itself." *United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc). "We give the words of a statute their 'ordinary, contemporary, common meaning,' absent an indication Congress intended them to bear some different import." *Williams v. Taylor*, 529 U.S. 420, 431 (2000) (quoting *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207 (1997)).

As quoted above, § 3292 permits the United States to file an "application . . . indicating that evidence of an offense is in a foreign country." 18 U.S.C. § 3292(a)(1). Then, the district court "before which a grand jury is impaneled to investigate *the offense* shall suspend the running of the statute of limitations for *the offense* if" it "finds by a preponderance of the evidence that an official request has been made for such evidence and that it reasonably appears" that "such evidence" is abroad. *Id.* (emphasis added). "Words are

to be given the meaning that proper grammar and usage would assign them." A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 140 (2012). In this case, "grammar and usage establish that 'the' is 'a function word . . . indicat[ing] that a following noun or noun equivalent is definite or has been previously specified by context.'" *Nielsen v. Preap*, 586 U.S. 392, 408 (2019) (quoting MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1294 (11th ed. 2005)). Where a law uses a "definite article with a singular noun," the law refers to a "discrete thing." *Niz-Chavez v. Garland*, 593 U.S. 155, 166 (2021). On a plain reading of our statute, therefore, a district court can only toll the statute of limitations for "an offense" if the United States files an application indicating that evidence of "the offense"—*i.e.*, that definite or previously specified offense—is in a foreign country. Likewise, the district court must find by a preponderance of the evidence that evidence of that definite or previously specified offense is or was reasonably likely to be in a foreign country.

Based on this plain-text reading of the statute, which is unambiguously offense-specific, we conclude that the district court erred in suspending the limitations period for Counts 10 and 11, because the government's tolling application did not indicate that evidence of those offenses was located in a foreign country, and the district court never found by a preponderance of the evidence that such evidence was abroad.

While the government does not appear to contest this plain-text reading, it argues that its application was sufficient because the

23-13254          Opinion of the Court          15

government, when applying for tolling, need not identify offenses by statutory citation, and, instead, "need only provide a reasonably specific description of the offenses under investigation" to meet the requirements of § 3292(a)(1). The government claims that its description of the offenses was specific enough to encompass the failure-to-file offenses later charged in Counts 10 and 11, because the application "described the grand jury's investigation of multiple offenses, including defendant's 'potential failure to report all income earned.'"

We agree that the text of § 3292(a)(1) does not *require* the government to list by citation the offenses that may have been committed. But we are hesitant to create a rule so broad that it would allow the government to paint with a wide brush and later be able to sweep in (and prolong the statute of limitations for) all sorts of offenses not mentioned in its application.[2] On the government's view of the sufficiency of an application, the government can seemingly "[meet] the standard" for tolling as long as it "describe[s]" an offense with reasonable specificity. As the government

---

[2] In one out-of-circuit case cited by the United States, for example, a district court held that an application was sufficiently "specific" to toll the statute of limitations on a tax-fraud count not mentioned in the application or tolling order, because "tax fraud is *intimately related to* the wire fraud, money laundering, and conspiracy to commit money laundering offenses that were under investigation and listed in the application and tolling [o]rder." *United States v. Swartzendruber*, 2009 WL 485144, at *5 (D.N.D. Feb. 25, 2009) (emphasis added).

argued below, "even though the government's application paperwork did not cite to 26 U.S.C. § 7203, there can be no dispute that the application described the offense of failing to file a tax return," and "[t]hat is all the statute requires."

But that is not all the statute requires. As both the statutory language and our case law make plain, § 3292(a)(1) requires the government *and* the district court to satisfy a preponderance-of-the-evidence standard. The government must meet that standard by providing reliable evidence that evidence of each offense at issue is reasonably likely to be located abroad. *See Trainor*, 376 F.3d at 1336 (the government must provide evidence "that it reasonably appears *the requested evidence* is in a foreign country" (emphasis added)); *id.* at 1332 (the government must provide something with evidentiary value "tending to prove it is reasonably likely that evidence *of the charged offenses* is in a foreign country" (emphasis added)). For its part, the court "to whom the application is presented" must find, again by a preponderance, that "(1) the Government has made an official request for evidence located in a foreign country, and (2) 'it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country.'" *Id.* at 1328 (quoting § 3292(a)(1)). So, while the text of § 3292(a)(1) does not require the government to enumerate offenses by citation, we reject the argument that the government's description of an offense—which, in this case, did not even describe the offense of failing to file income tax returns—is "all the statute requires."

At a high level, "Congress has declared a policy that the statute of limitations should not be extended '(e)xcept as otherwise expressly provided by law.'" *Toussie v. United States*, 397 U.S. 112, 15 (1970) (quoting 18 U.S.C. § 3282). When any doubt exists about the statute of limitations in a criminal case, the limitations period is construed narrowly against the government and in favor of the defendant. *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 95 (2006); *United States v. Gilbert*, 136 F.3d 1451, 1454 (11th Cir. 1998). This rule is "designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past. Such a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity." *Toussie*, 397 U.S. at 114–15. Whenever statutory terms "extend[ ] the statute of limitations," those terms should be construed "narrowly." *United States v. Maher*, 955 F.3d 880, 885 (11th Cir. 2020) (citing *Toussie*, 397 U.S. at 115).

With all this in mind, we think the best way to construe § 3292(a)(1) is to require the government to identify the offense or offenses at issue with enough specificity to 1.) make clear to the judge to whom the application is presented which charges the government seeks to be tolled, and 2.) "elicit evidence of the alleged violations under investigation by the grand jury." *United States v. Wilson*, 249 F.3d 366, 374 (5th Cir. 2001) (quoting *United States v. Neill*, 952 F. Supp. 831, 833 (D.D.C. 1996)), *abrogated on other grounds by Whitfield v. United States*, 543 U.S. 209 (2005). For example, in

*Wilson*, the Fifth Circuit affirmed a district court's § 3292 tolling order and rejected the appellant's argument that the government's "request was not sufficient to toll the statute of limitations with regard to 18 U.S.C. § 1957, because that statute was not specifically enumerated in the letter." 249 F.3d at 374. *Wilson* relied on the fact that the government used the phrase "money laundering" in its tolling application, and a violation of 18 U.S.C. § 1957 is commonly referred to as "money laundering." *See id*. ("This circuit has referred to a violation of 18 U.S.C. § 1957 as 'money laundering.'"). As such, it was "clear" to the court that the "[g]overnment's use of the phrase 'money laundering' in its request for assistance was 'reasonably specific' [to elicit evidence of the alleged violations under investigation] and adequate to toll limitations for this offense." *Id*.

Having come to this conclusion, we return to the analysis in this case. As an initial matter, we find it irrelevant that one of the "Target Offenses" in the tolling application was tax evasion in violation of 26 U.S.C. § 7201. The parties agree that (at least under the *Schmuck* test) § 7203 is not a lesser-included offense of § 7201, because the former offense "requires an element not required for the greater offense." *Schmuck v. United States*, 489 U.S. 705, 716 (1989).

Next, the government did not meet the requirements of § 3292(a)(1) to toll Counts 10 and 11, and the reference to Gyetvay's failure to file taxes in a declaration was inadequate. The government's application did not identify § 7203 as an offense under investigation. And the application's broad language—referencing Gyetvay's "potential failure to report all income earned through the

accounts"—is insufficient to cover or encompass "the offense" of failure to file timely income tax returns. Because the specific offense of willful failure to file income tax returns was not mentioned in the government's application, the government did not satisfy the requirements of § 3292(a)(1) to suspend the running of the statute of limitations for Counts 10 and 11.

Gyetvay also argues that the district court independently failed to make findings as required by the tolling statute. We agree. Recall, under § 3292(a)(1), the district court must "find[ ] by a preponderance of the evidence that an official request has been made for [evidence of an offense in a foreign country] and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country." A district court "can do this only if it is given something with evidentiary value, that is, something bearing indicia of reliability, to evaluate." *Trainor*, 376 F.3d at 1332. But the court must itself make findings supported by a preponderance of the evidence before suspending the running of the statute of limitations for the offense under investigation. After all, due to the *ex parte* nature of § 3292 proceedings, "the district court is responsible for ensuring that [a defendant's] interests are protected." *Id.*

Here, the district court made no findings whatsoever on evidence of a violation of § 7203 in its order granting the *ex parte* application, instead making findings on the "Target Offenses" alone. The court found, based on a preponderance of the evidence, that "it reasonably appears that evidence *of the Target Offenses* is located

in Switzerland, Russia, and Cyprus," but it made no such finding regarding evidence of Gyetvay's failure to file income tax returns. Thus, even if the government's application somehow encompassed the violations alleged in Counts 10 and 11, those charges were not properly tolled, because the order issued by the district court did not contain the requisite findings for any offenses outside of the "Target Offenses." The district court, therefore, erred in retroactively applying the tolling order to Counts 10 and 11, because it never found by a preponderance of the evidence that evidence of Gyetvay's failure to file in 2013 and 2014, in violation of § 7203, was located in a foreign country.

For these reasons, we conclude that Counts 10 and 11 are time-barred. We reverse Gyetvay's convictions on those counts, vacate his sentence, and remand for resentencing.

### B.    Fourth Amendment Challenge

Next, Gyetvay argues that the district court erred in denying his motion to suppress evidence obtained from a search warrant for his email account because the warrant and seizure violated the Fourth Amendment.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The Warrant Clause of the Fourth Amendment "categorically prohibits the issuance of any warrant except one 'particularly describing the place to be searched and the persons or things to be seized.'" *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (quoting U.S. CONST. amend.

23-13254                Opinion of the Court                21

IV).  As the Supreme Court has explained, the "manifest purpose" of the particularity requirement is to "prevent general searches." *Id*.  "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit."  *Id*.

On February 21, 2020, a magistrate judge signed a search and seizure warrant authorizing a search of "[t]he content of all emails associated with" Gyetvay's Yahoo.com email account "for the period January 1, 2005 to November 11, 2019."  Under the section titled "Information to be seized by the government," the warrant authorized law enforcement personnel to "review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of a scheme to hide assets in offshore entities and accounts and evade taxation on income derived from such assets, specifically the crimes of: (i) evading taxes, in violation of 26 U.S.C. § 7201; (ii) making and subscribing to a false tax return, in violation of 26 U.S.C. § 7206(1); (iii) aiding and assisting in the preparation of a false tax return, in violation of 26 U.S.C. § 7206(2); (iv) willfully failing to make a tax return, in violation of 26 U.S.C. § 7203; (v) willfully failing to file, or willfully filing a false, report of foreign bank account, in violation of 31 U.S.C. §§ 5314, 5322; and (vi) wire fraud and conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1343 and § 1349."  The warrant further specified the types of evidence it sought to uncover, including "[e]vidence concerning any domestic or foreign properties, assets, financial

interests, personal expenditures, and/or bank accounts held in Gyetvay's name or nominally held by other individuals or entities," "[e]vidence reflecting communications or correspondence between Gyetvay and his accountants and advisors about structuring financial transactions and/or Gyetvay's assets in a manner to conceal Gyetvay's ownership of the assets," and "[e]vidence reflecting communications or correspondence involving Gyetvay and any business partner, associate, friend or relative demonstrating Gyetvay's decision to allocate time, resources, and effort on affairs and matters other than complying with his tax and other filing obligations."

Gyetvay takes issue with this last clause, arguing that "[a] search warrant that demands all emails relating to the identified tax activities, and emails not relating to those activities, simply demands all emails." He also argues that the categories relating to his financial activities were not drawn with particularity. Gyetvay moved to suppress the warrant on September 2, 2022, on similar grounds. On December 19, 2022, the district court denied Gyetvay's motion to suppress. The court held, first, that the motion was untimely, because it was "filed eleven months after Defendant received the search materials in discovery, [ ] long after the [c]ourt's deadline for pretrial motions," and "eleven months after receiving a copy of the warrant and affidavit." The district court then held that, "even if the motion were timely filed, the [c]ourt would still deny relief," since the warrant "appears to be sufficiently particular in light of the complex nature and sizeable time duration of the tax fraud scheme Defendant is accused of committing."

In reviewing a district court's denial of a motion to suppress evidence, we ordinarily review the court's findings of fact for clear error and the court's application of the law to those facts *de novo*. *United States v. Noriega*, 676 F.3d 1252, 1259 (11th Cir. 2012). However, when a district court denies a motion to suppress on the basis of untimeliness, we review for an abuse of discretion. *United States v. Smith*, 918 F.2d 1501, 1509 (11th Cir. 1990); *see also United States v. Taylor*, 792 F.2d 1019, 1025 (11th Cir. 1986), *cert. denied*, 481 U.S. 1030 (1987) (holding that the district court did not abuse its discretion where the defendant challenged the denial of his motion to suppress on timeliness grounds); *United States v. Andres*, 960 F.3d 1310, 1315 (11th Cir. 2020) ("We review for abuse of discretion the denial of [a] motion to suppress on the grounds of timeliness." (citing *Smith*, 918 F.2d at 1509)).[3] When a party fails to establish good cause for an untimely motion to suppress, the issue raised in the motion is not preserved, so we review the merits of the motion for plain error. *Andres*, 960 F.3d at 1315–16; *United States v. Milian-*

---

[3] *Smith* and *Taylor* interpreted the prior version of Rule 12 of the Federal Rules of Criminal Procedure, which has since been amended. The amended version went into effect on December 1, 2014. This Court has continued to apply the abuse-of-discretion standard to denials of untimely pretrial motions under the amended version of Rule 12. *See, e.g.*, *Andres*, 960 F.3d at 1315; *United States v. Bowers*, 811 F.3d 412, 421 (11th Cir. 2016) ("Bowers moved to sever the indicted counts after the district court's pre-trial-motion deadline, but before his trial, and with no attempt to establish good cause for his delay. His motion was, therefore, untimely under pre-amendment Rule 12(e) and would likewise be untimely under amended Rule 12(c)(3).").

*Rodriguez*, 828 F.2d 679, 683–84 (11th Cir. 1987); *United States v. Bowers*, 811 F.3d 412, 421 (11th Cir. 2016).

Under Rule 12 of the Federal Rules of Criminal Procedure, any motion for the suppression of evidence must be made before trial. FED. R. CRIM. P. 12(b)(3)(C). The district court may "set a deadline for the parties to make pretrial motions and may also schedule a motion hearing. If the court does not set one, the deadline is the start of trial." FED. R. CRIM. P. 12(c)(1). "If a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause." FED. R. CRIM. P. 12(c)(3).

The district court did not abuse its discretion in denying Gyetvay's motion to suppress on timeliness grounds here. The deadline to file pretrial motions was October 7, 2021. Gyetvay filed his motion to suppress on September 2, 2022—nearly eleven months later. We recognize that Gyetvay did not receive a copy of the warrant until around October 7, 2021, the same time as the motions deadline. But Gyetvay never moved for an extension of time, nor did he even acknowledge the motion's untimeliness or attempt to show good cause when he eventually filed his motion to suppress.

Again, Rule 12 provides that a district court may consider an untimely motion to suppress only if the moving party "shows good cause." FED. R. CRIM. P. 12(c)(3). Gyetvay did not do so in his untimely motion to suppress or in a motion for extension of time, so we cannot conclude that the district court abused its discretion in

denying the motion as untimely. *See, e.g.*, *Milian-Rodriguez*, 828 F.2d at 682–83 (affirming district court's denial of motion to suppress as untimely on abuse-of-discretion standard where the appellant moved for reconsideration of the court's suppression decision forty-nine days after the filing deadline, and the appellant's justification that he only recently learned of intervening case law did not suffice); *Andres*, 960 F.3d at 1316 (holding that the district court did not abuse its discretion in denying motion to suppress as untimely because the defendant's "decision to not timely file a motion to suppress . . . based on his belief that he would be subject to mandatory life imprisonment" did not constitute good cause).

In his reply brief, Gyetvay argues that the district court's denial of his suppression motion was an abuse of discretion because he received the warrant at the same time as the deadline, he filed his suppression motion six months before trial, and the "government nowhere identifies an earlier deadline that Gyetvay should have met." But we have held that claims made in pretrial motions were untimely and, therefore, forfeited[4] where the defendant "moved to sever the indicted counts after the district court's pretrial-motion deadline, but *before his trial*, and with no attempt to establish good cause for his delay." *Bowers*, 811 F.3d at 421

---

[4] Prior to the 2014 amendments, Rule 12 used the term "waived" to refer to a motion not timely filed. Under the new version of the rule, which omits the word "waived," untimely motions are considered "forfeited rather than waived." *Bowers*, 811 F.3d at 421.

(emphasis added). So too here, Gyetvay filed his motion to suppress before trial but offered no good cause for his eleven-month delay.

Moreover, the question before us is whether the district court abused its discretion in denying the motion as untimely—not whether the government should have identified an earlier deadline, nor whether the district court could (or even should) have handled the motion differently. *See Blasland, Bouck & Lee, Inc. v. City of North Miami*, 283 F.3d 1286, 1298 (11th Cir. 2002) ("When a district court has discretion, there are usually a range of choices it may make and still be affirmed; there is not only one right choice for the court to make."); *In re Rasbury*, 24 F.3d 159, 168 (11th Cir. 1994) ("By definition[,] under the abuse of discretion standard of review there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call. That is how an abuse of discretion standard differs from a *de novo* standard of review."). In this case, the court simply enforced its own deadline after Gyetvay failed to show good cause to excuse his eleven-month delay in filing a motion to suppress. A district court's "scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." *Cruz v. Bristol-Myers Squibb Co., PR, Inc.*, 699 F.3d 563, 570 (1st Cir. 2012) (quoting *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 610 (9th Cir. 1992)). Rule 12 is clear that the onus is on the untimely party to show good cause, and Gyetvay did not do so here.

Additionally, Gyetvay argues that a denial of a motion to suppress on timeliness grounds is an abuse of discretion where the court also reaches the merits of the motion. But our case law belies this assertion. In *Milian-Rodriguez*, for example, we held that the district court did not abuse its discretion in finding that a motion to reconsider a suppression order was untimely, then proceeded to hold that the district court's failure to suppress the evidence was not plain error. 828 F.2d at 683–84. We rejected the appellant's proposition that a party's forfeiture through untimeliness "is excused if the district court proceeds to entertain the merits of the party's untimely motion." *Id.* at 683. For all these reasons, then, we conclude that the district court did not abuse its discretion in denying Gyetvay's motion to suppress as untimely, because the motion was filed eleven months after the deadline set by the court, and Gyetvay did not show good cause for the delay, as required by Rule 12(c)(3).

Because the district court did not abuse its discretion in denying Gyetvay's motion to suppress as untimely, we review the underlying merits of the motion for plain error. *Andres*, 960 F.3d at 1315–16; *Bowers*, 811 F.3d at 421. Under plain-error review, we will reverse a district court's decision only if (1) an error occurred; (2) the error was plain; (3) it affected the appellant's substantial rights; and (4) it seriously affected the fairness, integrity, or public reputation of judicial proceedings. *United States v. Doyle*, 857 F.3d 1115, 1118 (11th Cir. 2017). We conclude that the district court did not plainly err in declining to suppress the evidence obtained through the search warrant.

In *United States v. McCall*, we recently held that "there are generally two types of limitations that can particularize [ ] a warrant" authorizing a search of someone's digital account. 84 F.4th 1317, 1327 (11th Cir. 2023). The first type of limitation that can satisfy the particularity requirement is "narrowing the search based on the subject matter of the data. For example, a warrant may limit investigators' search of communications data to only communications with known or suspected co-conspirators." *Id*. The second and "preferred method of limiting the scope of a search warrant for a cloud account" is a "temporal limitation." *Id*. at 1327–28. As we explained in *McCall*: "By narrowing a search to the data created or uploaded during a relevant time connected to the crime being investigated, officers can particularize their searches to avoid general rummaging. Cloud or data-based warrants with a sufficiently tailored time-based limitation can undermine any claim that they are the internet-era version of a 'general warrant.'" *Id*. at 1328 (internal quotations omitted).

Here, the district court determined that the warrant was sufficiently particularized because it laid out discrete categories of evidence to be searched. Specifically, the warrant laid out ten categories of evidence that officers were allowed to search and that were tailored to the crimes under investigation. Some of these categories used narrow language, such as "[e]vidence concerning any domestic or foreign bank accounts held by Gyetvay, including in his name, in the name of a nominee entity, and in the name of a nominee individual." Nonetheless, Gyetvay argues that other categories were overbroad because they sought "communications about

taxes and *not* about taxes" and "thus included 'every email' he sent over 14 years."

We are not convinced by this interpretation of the warrant. The warrant does authorize law enforcement personnel to locate evidence of communications between Gyetvay and his accountants about any issues related to "taxes [and] the avoidance of taxes," as well as evidence "involving Gyetvay and any [associate] demonstrating Gyetvay's decision to allocate time, resources, and effort on affairs . . . *other than* complying with his tax and other filing obligations" (emphasis added). Gyetvay takes this language to mean that the warrant authorizes a search for every email he ever sent over 14 years. While the "other than" language is admittedly imprecise, we interpret the phrase, "decision to allocate time and resources on affairs *other than* complying with his tax and other filing obligations" to mean, "decision to allocate time and resources *away from* complying with his tax obligations." This interpretation is bolstered by the language of the indictment, which alleged that, between 2005 and 2015, Gyetvay transferred funds in and out of Swiss bank accounts "to make personal investments and to pay for various personal expenses, including the purchase of art, motor vehicles, and real estate." Additionally, the warrant was expressly targeted at uncovering evidence of a scheme to "evade taxation" and "conceal Gyetvay's ownership of [ ] assets." We are thus disinclined to interpret the warrant's "other than" language as "simply demand[ing] all emails."

In any event, as the district court also noted, even if a warrant is overbroad, "we do not suppress evidence on overbreadth grounds if the warrant 'adequately conveys its parameters.'" *McCall*, 84 F.4th at 1328 (quoting *United States v. Delgado*, 981 F.3d 889, 899 (11th Cir. 2020)). Here, investigating officers "reasonably could have believed" that the ten categories of account information requested "fell within the practical margin of flexibility for [the] broad investigative task." *Id.*; *see also United States v. Schandl*, 947 F.2d 462, 465–66 (11th Cir. 1991) (upholding denial of motion to suppress where "[i]t was inevitable that some irrelevant materials would be seized as agents searched through numerous documents for evidence of tax evasion and failure to file, crimes that are generally only detected through the careful analysis and synthesis of a large number of documents").

The warrant also contained a temporal limitation—the "preferred method" of particularization for the scope of a search warrant. *McCall*, 84 F.4th at 1328. The warrant specified a time period for the information to be produced (January 1, 2005, to November 11, 2019), which corresponded exactly to the time period the government was investigating: The indictment states that Gyetvay opened the "Opotiki" Swiss bank account "[i]n or about September and October of 2005," and the government averred in its affidavit filed in support of the warrant that the "Subject Account was being accessed, or logged into, up until on or about November 11, 2019." Time-based limitations on the search of an email account, especially when combined with subject-matter limitations, prevent the sort of "general, exploratory rummaging . . . abhorred by the

colonists." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). That is, "[b]y narrowing a search to the data created or uploaded during a relevant time connected to the crime being investigated, officers can particularize their searches to avoid general rummaging." *McCall*, 84 F.4th at 1328.

We have upheld similar warrants as sufficiently particular even where those warrants did not set out a temporal limitation. In *United States v. Blake*, for instance, we found sufficiently particular a warrant that "was limited to certain categories of emails," 868 F.3d 960, 966 (11th Cir. 2017), even though the warrant "did not limit the emails sought to emails sent or received within the time period of [the defendant's] suspected participation in the conspiracy," *id.* at 973 n.7. Despite the "lack of a time limitation," we reasoned, "the warrant was appropriately limited in scope because it sought only discrete categories of emails that were connected to the alleged crimes." *Id.* at 973 n.7. This subject-matter limitation alone "prevented a general, exploratory rummaging through [the defendant's] email correspondence." *Id.* at 973 (internal quotations omitted).

Here, by contrast, the warrant was circumscribed to ten categories of emails corresponding to Gyetvay's alleged crimes *and* the time period being investigated by the government. As a result, although the warrant authorized an extensive search over a lengthy period of time, we conclude that the district court did not plainly err in finding that the search and seizure warrant at issue in the

motion to suppress was sufficiently particularized so as not to be considered an unconstitutional general warrant.

### C.    Constructive Amendment and Material Variance

Next, Gyetvay argues that the government sought (and achieved) conviction under Count 13 for conduct not charged in the indictment. Specifically, Gyetvay argues that, although Count 13 charged him with "Failure to File [an] FBAR" for the calendar year 2014, the government never proved failure to file for that year, instead proving to the jury that Gyetvay filed a *false* 2014 FBAR— "a crime for which [he] was not indicted." In Gyetvay's view, the government's argument that he filed an FBAR that failed to disclose one of his Swiss accounts went beyond what was charged in the indictment, violating the Fifth Amendment's dictate that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. CONST. amend. V. This clause, known as the Grand Jury Clause, "does not 'permit a defendant to be tried on charges that are not made in the indictment against him' or convicted on theories that the indictment 'cannot fairly be read as charging.'" *United States v. Feldman*, 931 F.3d 1245, 1259–60 (11th Cir. 2019) (quoting *Stirone v. United States*, 361 U.S. 212, 217 (1960)).

Two distinct errors can arise when the evidence at trial or the court's jury instructions deviate from what was charged in the indictment. *United States v. Flynt*, 15 F.3d 1002, 1005 (11th Cir. 1994). The first category of error is a constructive amendment, which occurs when the "essential elements of the offense contained in the

indictment are altered—for instance, by a faulty jury instruction— to broaden the possible bases for conviction beyond what [was] contained in the indictment." *Feldman*, 931 F.3d at 1260 (internal quotations omitted). A constructive amendment of the indictment is "*per se* reversible because it violates the defendant's constitutional right to be tried solely on the charges returned by the grand jury." *United States v. Johnson*, 713 F.2d 633, 643 (11th Cir. 1983). The second type of error is a material variance, which occurs "when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *Id*. at 643 n.9. Unlike with a constructive amendment, a variance requires reversal only when the defendant "suffered substantial prejudice as a result." *United States v. Goldstein*, 989 F.3d 1178, 1198 (11th Cir. 2021). For example, we consider a variance to be prejudicial when "the proof at trial differed so greatly from the charges that [the defendant] was unfairly surprised and was unable to prepare an adequate defense." *United States v. Lander*, 668 F.3d 1289, 1295 (11th Cir. 2012).

Here, Gyetvay argues that the government constructively amended or "at least" materially varied from the allegations contained in Count 13 of the superseding indictment, which charged Gyetvay with failing to file an FBAR for the calendar year 2014. We disagree as to both contentions.

First, there was no constructive amendment of Count 13 because Gyetvay was convicted of the same offense that was alleged in the indictment. As we've said, constructive amendment can

occur when the evidence presented at trial or the instructions given to the jury so alter the essential elements of the offense alleged in the indictment that the defendant is ultimately convicted on a ground not charged. *Feldman*, 931 F.3d at 1260; *United States v. Gonzalez*, 661 F.2d 488, 492 (5th Cir. Unit B 1981).[5]  Constructive amendment does *not* occur when a jury instruction "did not exactly match the form of the indictment"—so long as "the substance of the indictment remained intact." *United States v. Vernon*, 723 F.3d 1234, 1264 (11th Cir. 2013).  In this case, the superseding indictment charged Gyetvay with "willfully fail[ing] to file . . . an FBAR[ ] disclosing that he had a financial interest in, and signature and other authority over, a bank[ ] account in a foreign country, which had an aggregate value in excess of $10,000 during the 2014 calendar year, to wit, the Opotiki account—Acct xxx4056—at Falcon,"[6] in violation of 31 U.S.C. §§ 5314 and 5322(a).  In turn, the district court instructed the jury that "Count 13 charges that the defendant willfully failed to file a report with the Department of the Treasury that disclosed his ownership and signatory or other authority over a foreign financial account that contained more than $10,000."

---

[5] Decisions issued by Unit B of the former Fifth Circuit are binding precedent in the Eleventh Circuit. *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

[6] In 2013, Falcon Private Bank AG, another Swiss bank, acquired the assets of Hyposwiss and became the custodian of Gyetvay's Opotiki and Felicis accounts.

We find no meaningful difference between the offense charged in the indictment and the instructions given to the jury. While the district court's instruction on Count 13 may not have parroted the language of the indictment, the substance of the charge remained intact. *Vernon*, 723 F.3d at 1264. Moreover, the district court specifically explained to the jury that "[i]t is a Federal crime for a U.S. citizen or resident to willfully fail to report to the United States Treasury his or her ownership, signatory, authority, or control over *each* foreign financial account that contains more than $10,000 at any point during the year" (emphasis added). And the court instructed the jury that, under Count 13, the burden was on the government to prove that Gyetvay failed to file an FBAR "that reports *all* of the defendant's foreign financial accounts." All of these instructions mirror what Count 13 charged: that Gyetvay violated 31 U.S.C. §§ 5314 and 5322(a) by failing to file an FBAR disclosing *one* of his foreign bank accounts.

Furthermore, both the text of the indictment and the jury instructions reflect that § 5314 is violated when one fails to file a *compliant* FBAR. As the Supreme Court has explained:

> When it comes to the duty to file reports, . . . [§ 5314] says that reports "shall contain" information about "the identity and address of participants in a transaction or relationship," "the legal capacity in which a participant is acting," and "the identity of real parties in interest," along with a "description of the transaction." §§ 5314(a)(1)–(4). The law also directs the Secretary to prescribe "the way and . . . the extent" to which reports must be filed. § 5314(a).

. . . .

> [T]he relevant legal duty is the duty to file reports. Of
> course, those reports must include various kinds of
> information about an individual's foreign "transac-
> tion[s] or relationship[s]."  But whether a report is
> filed late, whether a timely report contains one mis-
> take about the "address of [the] participants in a trans-
> action," or whether a report includes multiple willful
> errors in its "description of . . . transaction[s]," the
> duty to supply a compliant report is violated.  Put an-
> other way, the statutory obligation is binary.  Either
> one files a report "in the way and to the extent the
> Secretary prescribes," or one does not.  Multiple will-
> ful errors about specific accounts in a single report
> may confirm a violation of § 5314, but even a single
> nonwillful mistake is enough to pose a problem.  One
> way or another, § 5314 is violated.

*Bittner*, 598 U.S. at 93.  In other words, one commits the offense of
failure to file under § 5314 when one files an inaccurate or non-
compliant FBAR.  Both the indictment and the jury instructions re-
flect the Supreme Court's interpretation of the statute.

Nor did the government's evidence at trial constructively
amend Count 13 by modifying the essential elements of the offense
charged.  The government argued to the jury and presented evi-
dence that Gyetvay filed a 2014 FBAR in which "he only disclose[d]
one of his Swiss accounts" but "left off" a second Swiss account,
the Opotiki account, containing over eight million dollars.  This
evidence did not broaden the possible bases for conviction or

modify the elements of the crime charged in the indictment, which (again) alleged that Gyetvay filed a 2014 FBAR that failed to disclose one foreign financial account.  In sum, the indictment, the jury instructions, and the evidence presented at trial all referred to Count 13 in the same way—as charging Gyetvay with failure to file a 2014 FBAR that disclosed the Opotiki account.  Therefore, we conclude that there was no constructive amendment here.

For similar reasons, we conclude that the government did not materially vary from the allegations laid out in the indictment. A material variance differs from a constructive amendment in that a variance "occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Salinas*, 654 F.2d 319, 324 (5th Cir. Unit A 1981), *overruled in part on other grounds by United States v. Adamson*, 700 F.2d 953 (5th Cir. 1983). This Court has explained that "[a] fatal variance exists only 'where the evidence at trial proves facts *different* from those alleged in the indictment, as opposed to facts which, although not specifically mentioned in the indictment, are entirely consistent with its allegations.'"  *Goldstein*, 989 F.3d at 1198–99 (quoting *United States v. Champion*, 813 F.2d 1154, 1168 (11th Cir. 1987)).  A variance in the proof justifies reversal only where the defendant has been "substantially prejudiced thereby," *Flynt*, 15 F.3d at 1005; that is, when the evidence presented at trial "affect[ed] a substantial right of the accused," *Gonzalez*, 661 F.2d at 492.

Gyetvay argues that the government "prejudicially varied Count 13" because the evidence at trial "show[ed] that Gyetvay timely filed his 2014 FBAR," whereas the indictment charged "Failure to File." But the timeliness of Gyetvay's 2014 FBAR is immaterial, as the indictment charged Gyetvay, in Count 13, with failure to file an FBAR *"disclosing that he had a financial interest in, and signature and other authority over, a bank, securities, and financial account in a foreign country . . . to wit, the Opotiki account"* (emphasis added). As Gyetvay himself tells us, the government argued at trial that Gyetvay filed a deficient FBAR that disclosed only one of his Swiss bank accounts, while leaving off the Opotiki account. Indeed, Gyetvay concedes that, when filling out his 2014 FBAR, he intentionally "omitted the Opotiki account" because he "[ran] out of blank fields" on the form. We thus reject that the evidence offered at trial proved facts materially different from those alleged in the indictment. *See Goldstein*, 989 F.3d at 1198–99. Therefore, we need not reach whether Gyetvay was substantially prejudiced, because there was no material variance here. *See United States v. Seher*, 562 F.3d 1344, 1366 (11th Cir. 2009) ("Only after making the finding of material variance do we need to examine whether the variance substantially prejudiced the defendant.").

In sum, we conclude that the government neither constructively amended nor materially varied from the allegations contained in Count 13 of the superseding indictment.

### D.    Sentencing Errors

Lastly, Gyetvay argues that the district court committed a variety of errors at sentencing, including in calculating his guideline range and ordering him to pay $4,021,074 in restitution.

### 1.    Relevant Conduct

We begin with the guideline range.  As background, Gyetvay's guideline range was calculated using U.S.S.G. § 2S1.3, which corresponds to Count 13 as the offense of conviction (failure to file a 2014 FBAR in violation of 31 U.S.C. §§ 5314 and 5322(a)).[7] Section 2S1.3 of the Sentencing Guidelines directs the sentencing court to assign to the defendant a base level of "6 plus the number of offense levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the funds" in the defendant's unreported foreign accounts.    § 2S1.3(a)(2).    Here, the PSI

---

[7] Gyetvay's four counts of conviction were grouped together under U.S.S.G. § 3D1.2, which provides that "[a]ll counts involving substantially the same harm shall be grouped together into a single Group." "Counts involve substantially the same harm within the meaning of this rule . . . . [w]hen the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior." *Id*. § 3D1.2(d). "In the case of counts grouped together pursuant to § 3D1.2(d), the offense level applicable to a Group is the offense level corresponding to the aggregated quantity, determined in accordance with Chapter Two and Parts A, B and C of Chapter Three." *Id*. § 3D1.3(b). "When the counts involve offenses of the same general type to which different guidelines apply," the sentencing court applies the offense guideline that produces the highest offense level. *Id*.

determined that Gyetvay "did not file FBAR's [sic] for 2005 through 2007 and filed untimely FBAR's [*sic*] for 2008 through 2013, [so] those funds are also being considered."  The PSI calculated the "value of the funds" as the sum of (1) the "high balance" of the unreported Opotiki account in 2014 ($8.7 million), and (2) the combined value of the unreported Opotiki and Felicis accounts in 2013, when their combined value was the highest ($93.4 million).  The total value of the funds attributable to FBAR violations was thus $102,112,774, increasing Gyetvay's base offense level to 30.[8]  The district court found that the PSI correctly calculated the guidelines, though it imposed a below-guidelines sentence of 86 months.

On appeal, Gyetvay argues that the PSI and the district court erred in including the larger $93.4 million sum—the combined value of the unreported Opotiki and Felicis accounts in 2013—in his sentencing-range calculation.  Gyetvay argues that he was only "convicted of not disclosing the Opotiki account in his 2014 FBAR," so the district court should not have considered the value of his unreported accounts in 2013, including "the allegedly much larger value of the Felicis account," when calculating the total "value of the funds" under § 2S1.3(a)(2).

---

[8] Gyetvay's base offense level was then increased by two levels because he "(A) was convicted of an offense under subchapter II of chapter 53 of title 31, United States Code; and (B) committed the offense while violating another law of the United States or as part of a pattern of unlawful activity involving more than $100,000 in a 12-month period."  U.S.S.G. § 2S1.3(b)(2)(B).

We review the procedural reasonableness of a sentence, which includes whether the guideline range was properly calculated, under an abuse-of-discretion standard. *United States v. Register*, 678 F.3d 1262, 1266 (11th Cir. 2012). "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." *Id*. (internal quotations omitted). Sentencing objections not raised before the district court are reviewed on appeal for plain error. *United States v. Siegelman*, 786 F.3d 1322, 1330 (11th Cir. 2015). With respect to sentencing-guideline issues, this Court reviews a district court's factual findings for clear error, and, in most cases, a district court's application of the guidelines to the facts with due deference. *United States v. Rodriguez-Lopez*, 363 F.3d 1134, 1136–37 (11th Cir. 2004). Whether an act qualifies as relevant conduct under U.S.S.G. § 1B1.3 is a question of fact reviewed for clear error. *Siegelman*, 786 F.3d at 1332.

Under § 1B1.3 of the Guidelines, a district court must "consider all relevant conduct when determining the defendant's total offense level." *United States v. Bradley*, 644 F.3d 1213, 1296 (11th Cir. 2011). "[R]elevant conduct is broadly defined to include both uncharged and acquitted conduct that is proven at sentencing by a preponderance of the evidence." *Siegelman*, 786 F.3d at 1332. Under § 1B1.3, relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," as well as "all reasonably foreseeable acts and omissions of others in furtherance of" jointly undertaken criminal activity, "that were part of the same course of

conduct or common scheme or plan as the offense of conviction."
§ 1B1.3(a)(1)–(2). "Because § 1B1.3 calls for a factual finding that
certain conduct is 'relevant' to the offense of conviction, . . . a sen-
tencing court should make explicit relevant-conduct findings in or-
der to facilitate appellate review." *Siegelman*, 786 F.3d at 1331.
"[H]owever, a district court's failure to make such explicit findings
does not preclude appellate review—and therefore does not war-
rant reversal—'where the court's decisions are based on clearly
identifiable evidence.'" *Id*. (quoting *Bradley*, 644 F.3d at 1293).

In challenging the district court's inclusion of Felicis funds
in its § 2S1.3(a)(2) calculation, Gyetvay raises two separate but re-
lated arguments on relevant conduct. One, Gyetvay argues that
the district court failed to make "explicit relevant-conduct find-
ings." That is, according to Gyetvay, the district court erred by not
explicitly explaining why Gyetvay's reporting failures from 2005 to
2013 were "relevant conduct" under § 1B1.3. Two, Gyetvay argues
that his past late filings and non-filings were not, in fact, relevant
conduct. Because his "past FBAR non-filings were not relevant to
calculating the guidelines range on Count 13," he reasons, the dis-
trict court erred in "permit[ting] the addition of [$93.4] million to
the purported loss amount," which increased his guideline range
by four to five years.

We begin with Gyetvay's contention that the district court
erred in not explicitly finding that his non-disclosure of the Felicis
account up until 2014 qualified as relevant conduct. This issue is
reviewed for plain error because Gyetvay "did not object to the

district court's failure to explain why [his prior reporting failures] qualified as relevant conduct" below.[9] *Siegelman*, 786 F.3d at 1330.

We conclude that the district court did not plainly err. While the district court did not expressly articulate why it felt Gyetvay's prior reporting failures counted as "relevant conduct" under § 1B1.3, we know exactly from what evidence the district court reached its conclusion. During the sentencing hearing, the court referenced the "foreign bank account report table" at paragraph 25 of the PSI, which laid out the high balances in the Opotiki and Felicis accounts from 2005 to 2014. This table corresponded to IRS Agent Colleen Ranahan's graph of the annual high balances in those accounts over the same period, which was published at trial and discussed extensively on direct examination. The court also asked the government to explain paragraph 45 of the PSI, which discussed the "total value of funds attributable to FBAR violations." The government walked through its calculations, which were again supported by the evidence introduced at trial. After considering Gyetvay's arguments at sentencing, the district court

---

[9] Gyetvay insists that he did object to the PSI's use of the Felicis balance to calculate the aggregate sum of the funds and the guideline range. Gyetvay also stated in his notice of unresolved objections to the PSI that "[t]he funds involved in the reporting conduct for which Mr. Gyetvay was convicted can only involve the funds in the Opotiki account which was not timely reported." But these objections were directed toward the district court's ultimate inclusion of Felicis funds in its § 2S1.3 calculation, not the district court's failure to make factual findings. Where a party did not object to the district court's "failure to explain why" certain conduct qualified as relevant conduct, our review of that issue is for plain error only. *Siegelman*, 786 F.3d at 1330.

stated that it had "heard the evidence at trial," and it found that the evidence supported the "factual assertions" in the PSI "by the preponderance of the evidence at a minimum."

Because it is clear to us what evidence the district court relied upon in calculating its sentence, the district court did not plainly err by failing to provide an explicit relevant-conduct explanation. *See Siegelman*, 786 F.3d at 1331; *Bradley*, 644 F.3d at 1293 (finding "no error, much less plain error, in the district court's failure to make specific factual findings" because we could "easily determine on which evidence the court relied, and we require nothing more"). Therefore, reversal is not warranted on this basis.

The next question is whether Gyetvay's reporting failures between 2005 and 2013 were, in fact, relevant conduct such that $93.4 million should have been added to the value of the funds, increasing Gyetvay's base offense level to 30. Gyetvay argues that the PSI and the district court were wrong to consider his earlier untimely filings and his failure to disclose the Felicis account from 2008 to 2013 as relevant conduct for purposes of Count 13, which charged Gyetvay with failure to file an accurate 2014 FBAR. Gyetvay's 2014 FBAR did disclose the Felicis account. Upon review, we do not think the district court clearly erred in adopting the PSI's "relevant conduct" determination.

As defined by the Sentencing Guidelines, relevant conduct includes, "with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts," "all acts and omissions . . . that were part of the same course of conduct or

23-13254              Opinion of the Court                45

common scheme or plan as the offense of conviction."[10] § 1B1.3(a)(2).  The PSI includes a section explaining why Gyetvay's "untimely 2008–2013 FBARs are relevant conduct for the [c]ourt's consideration."  The PSI determined that Gyetvay's "earlier willful failures to file FBARs [were] appropriate relevant conduct" under both theories mentioned in the Sentencing Guidelines.  On the one hand, the PSI determined that "[t]he count of conviction and the earlier failures to disclose were part of a common scheme or plan given the common victim (the Department of Treasury) and the common purpose of the offense (concealing foreign bank accounts)."  On the other, the conduct proven in Count 13 and Gyetvay's prior reporting failures "were also part of the same course of conduct," since Gyetvay "consistently failed to disclose his Swiss

_____

[10] The commentary notes to the Guidelines state that offenses form the same course of conduct "if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses."  § 1B1.3(a)(2) cmt. n.5(B)(ii).  The commentary notes add that offenses can also form the same scheme or plan if they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi."  Id. at cmt. n.5(B)(i).  Further, "[t]he nature of the offenses may [ ] be a relevant consideration," such that "a defendant's failure to file tax returns in three consecutive years appropriately would be considered as part of the same course of conduct because such returns are only required at yearly intervals."  Id. at cmt. n.5(B)(ii).  But we do not "defer" to the commentary or application notes here because we do not find the text of § 1B1.3(a)(2) to be "genuinely ambiguous."  See United States v. Dupree, 57 F.4th 1269, 1274 (11th Cir. 2023) (en banc).

bank accounts," and "[h]is actions are best seen as one continuing attempt to hide these accounts."

We cannot say the district court clearly erred in adopting this determination. The government introduced evidence that Gyetvay never filed FBARs for calendar years 2005–2007 and failed to timely file FBARs for calendar years 2008–2013. The government also presented evidence that Gyetvay did not timely file income tax returns between 2005 and 2014. Gyetvay's counsel accepted, in closing, that Gyetvay's "returns were late-filed," and Gyetvay now admits that he "did not file timely tax returns or FBARs from 2008 to 2013." Additionally, the jury heard from Alex Knight, one of Gyetvay's accountants, who attested that his firm advised Gyetvay in 2010 "of his obligation to file [FBAR] forms for past years, but [Gyetvay] dismissed our recommendation and did not file such forms for years prior to 2010." Knight also testified that Gyetvay told Knight's firm that he had only one foreign bank account with a balance over $10,000, which Gyetvay now acknowledges was false, as his "Felicis account went undisclosed until the 2014 FBAR." This evidence indicates that Gyetvay concealed millions of dollars from the IRS for years at a time. The evidence presented at trial thus supports—at least by a preponderance—that Gyetvay's reporting failures from 2005 to 2013 were substantially connected to his reporting failure in 2014 through a common victim (the U.S. Department of Treasury) and a common course of conduct.

The evidence also supports the finding that Gyetvay's reporting failures from before 2014 had a common purpose with his

failure to report the Opotiki account on his 2014 FBAR: to conceal taxable money in Swiss bank accounts. The government showed, for instance, that after Gyetvay closed his accounts at Coutts (which were deemed by Coutts to be "not tax compliant"), he opened new accounts at Hyposwiss, this time listing his then-wife, Nadezda Gavrilova—a Russian citizen—as the beneficial owner of the Opotiki and Felicis accounts. Gavrilova testified at trial that she played no role in the finances of the household, and that she had no "dealings with any foreign bank accounts at all." She further testified that she "didn't know" that she was listed as an owner of foreign bank accounts. Douglas Miller, who worked with Gyetvay at PriceWaterhouseCoopers, testified that, in Russia, the process by which investors "own their shares through complicated structures," including by assigning "beneficial ownership" to others, is carried out in part to "disguise" assets. Based on our review of this evidence and other evidence in the record, we do not think the court clearly erred in finding that the PSI's relevant-conduct determination was adequately shown by a preponderance of the evidence.

Gyetvay insists that his "prior failures to file FBARs" are not relevant conduct because his 2014 FBAR, "unlike prior non-filings, [ ] disclosed the Felicis account." But the question is whether Gyetvay's prior non-disclosure of foreign accounts, particularly in 2013, is relevant to his non-disclosure of the Opotiki account in 2014—and the evidence supports *that* finding by a preponderance. We will not find clear error unless we are left with the definite and firm conviction that a mistake has been made. *United States v. White*, 335

F.3d 1314, 1319 (11th Cir. 2003).  We thus conclude that the district court did not clearly err in treating Gyetvay's pre-2014 reporting failures as relevant conduct because it "is plausible in light of the record viewed in its entirety" that Gyetvay's failure to report foreign accounts between 2005 and 2013 and his failure to report the Opotiki account on his 2014 FBAR were part of the same common scheme, plan, or course of conduct.  *See Siegelman*, 786 F.3d at 1333 (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)).

## 2.  Valuation of the Unreported Accounts

Gyetvay argues that, "apart from whether the Felicis account's value should have been considered at all, the district court failed to consider the account's proper valuation."  Gyetvay's theory is that the district court overvalued the funds in the Felicis account because the Felicis account contained Novatek stock, and, according to Gyetvay, Novatek stock is "not very liquid."  Gyetvay, therefore, urges us to vacate his sentence because the district court failed to calculate the stock's fair market value.

The district court did not clearly err in adopting the PSI's valuation of the Felicis account because the government supported its calculation with "reliable and specific evidence."  *United States v. Sepulveda*, 115 F.3d 882, 890 (11th Cir. 1997).  Under § 2B1.1(b)(1), "[t]he district court is permitted to base its loss determination on factual findings derived from, 'among other things, evidence heard during trial, undisputed statements in the PSI, or evidence presented during the sentencing hearing.'"  *Bradley*, 644 F.3d at 1290 (quoting *United States v. Polar*, 369 F.3d 1248, 1255 (11th Cir. 2004)).

"The district court needs only to make a reasonable estimate of the loss amount." *United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007).

Here, the PSI derived its calculation of the combined values of the Opotiki and Felicis accounts using IRS Agent Ranahan's calculations. Agent Ranahan testified and explained that she conducted her analysis by reviewing Gyetvay's bank statements and adding up all the assets. Agent Ranahan walked through her "graph of the annual high balance in the Opotiki and Felicis accounts" with the jury. She further testified that the highest figure—for 2013—was $93,412,774. Gyetvay himself came up with the same figure in his late-filed 2013 FBAR. In light of this evidence and testimony, we cannot say that the district court clearly erred in adopting the PSI's valuation of the Felicis account, because "the numbers and the calculations themselves were sufficiently specific," and "there is no indication that it was unreliable." *Bradley*, 644 F.3d at 1292. Gyetvay has not submitted proof that the government's "averages, estimates, or results are so wildly inaccurate as to be unreasonable." *Id*. And "neither this [C]ourt nor the Guidelines insist that district courts calculate the amount of loss with utmost precision; the Guidelines merely require the district court to reach a reasonable estimate of the loss amount." *Id*. at 1290. The evidence at trial and the PSI's arithmetic were sufficiently reasonable in this case.

### 3. Restitution

Finally, Gyetvay argues that the district court clearly erred in ordering him to pay $4,021,074 in restitution to the IRS. We review *de novo* the legality of a restitution order, while we review a factual finding regarding the specific amount of restitution for clear error. *United States v. Huff*, 609 F.3d 1240, 1247 (11th Cir. 2010).

The Mandatory Victims Restitution Act (the "MVRA") requires restitution for an "offense against property." 18 U.S.C. § 3663A(c)(1)(A)(ii). For an offense to qualify under this provision, "[p]roperty . . . must serve as the object of the offense, not simply a collateral component." *United States v. Collins*, 854 F.3d 1324, 1331 (11th Cir. 2017). This includes situations where a defendant "intends to damage another's property" or "seeks to derive an unlawful benefit from another's property or otherwise deprive a person of his property." *Id*. Criminal conduct does not automatically qualify as an offense against property "solely because it results in property damage or because someone suffers a loss at some point during its execution." *Id*. at 1331–32. When a district court orders restitution, it "must explain its findings with sufficient clarity to enable this court to adequately perform its function on appellate review." *Huff*, 609 F.3d at 1248; *see also* 18 U.S.C. § 3664(e) ("Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence.").

Gyetvay was convicted of Count 12 of the superseding indictment, which charged him with willfully making false statements on his IRS Streamlined Procedures certification, in violation

of 18 U.S.C. §§ 1001 and 2. According to the PSI, this conviction required mandatory restitution "because Gyetvay's false statements resulted in him avoiding other penalties, totaling $2,813,382, excluding interest." Adding interest in the sum of $1,207,692 to the underlying loss amount, the PSI provided a total restitution figure of $4,021,074. Gyetvay objected to both the legal basis for restitution and the amount imposed, arguing that the MVRA "does not apply . . . because the conviction in Count Twelve is not an 'offense against property.'" Without explanation, the district court adopted the PSI's figure and ordered Gyetvay to pay $4,021,074 in restitution to the IRS.

On appeal, Gyetvay again argues that his conviction under Count 12 "cannot support restitution" because the district court never found that that conviction was an offense against property. He adds that the district court never made findings that he "ha[d] the goal of causing property loss" to the government, or that the property loss was anything other than collateral or incidental.

We agree with Gyetvay on this point: The district court provided no explanation for the restitution amount being $4,021,074. This Court has held that a district court must make restitution findings with enough clarity to substantiate appellate review. *Huff*, 609 F.3d at 1248; *see also United States v. Singleton*, 649 F.3d 1212, 1222 (11th Cir. 2011) ("To enable meaningful appellate review, a district court's calculation of restitution must be supported by specific factual findings."). Here, the district court did not provide a single factual finding to support its restitution figure, much less address

Gyetvay's objection and explain why Count 12 counts as an offense against property, as opposed to an offense "with only incidental property loss." *Collins*, 854 F.3d at 1332.

It may well be true that the object of Gyetvay's offense of making false statements on his Streamlined Procedures certification, in violation of § 1001, was to intentionally deprive the IRS of property in the form of tax dollars, as the government posits. But the district court did not make that finding, nor does the government say it did. Because the district court gave us no factual findings to consider on the question of whether property served as the "object of the offense" in Count 12, *see id.* at 1331, "[t]he only course open to us . . . is to vacate the [restitution] order and remand the case for the district court to correct its oversight," *United States v. Maurya*, 25 F.4th 829, 837 (11th Cir. 2022); *see also Huff*, 609 F.3d at 1248–49 (vacating the restitution order and remanding for a limited resentencing on the sole issue of the amount of restitution because the district court "did not make specific factual findings of the victims' actual losses, as required by § 3664").[11] Accordingly, we vacate the restitution award and remand on this issue.

---

[11] In a notice of supplemental authority, Gyetvay argues that *United States v. Schwarzbaum*, 114 F.4th 1319 (11th Cir. 2024) shows that the restitution imposed in this case was improperly punitive rather than properly remedial. In *Schwarzbaum*, we held that "the FBAR penalty is a fine subject to the Eighth Amendment's Excessive Fines Clause." 114 F.4th at 1334. However, the civil FBAR penalty is not at issue in this case, so we decline to extend *Schwarzbaum*'s holding here.

### III.    CONCLUSION

For the foregoing reasons, we affirm Gyetvay's convictions on Counts 12 and 13, reverse Gyetvay's convictions on Counts 10 and 11, vacate his sentence, and remand to the district court for resentencing.  Additionally, we vacate the restitution order and direct the district court to reconsider the issue of restitution in accordance with this opinion.

**AFFIRMED IN PART; REVERSED IN PART; VACATED AND REMANDED IN PART.**